# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AQUENT, LLC,<br>501 Boylston Street, Boston, MA 02116 )<br><br>Plaintiff, )<br><br>v. )<br><br>AARP INC.,<br>601 E Street NW, Washington, DC 20049 )<br><br>Defendant. ) | Civil Action No. 1:24-cv-2949 |

## COMPLAINT

Plaintiff Aquent, LLC ("Aquent") brings the following Complaint for damages against Defendant AARP Inc. ("AARP") for AARP's breach of contract, and in the alternative, quantum meruit and unjust enrichment.

## INTRODUCTION

AARP and Aquent have harmoniously worked together for many years, until just recently when AARP walked away from open invoices totaling more than $7.5 million on specious grounds. Those invoices arise from two separate contracts that the parties entered in 2023. In one, Aquent agreed to provide employer of record services in which Aquent served as the employer for scores of employees who were working at AARP's offices under the supervision of AARP's managers. Under this arrangement, which is common in the staffing industry, Aquent advanced the cost of those employees' wages and benefits, while providing administrative services such as processing payroll, administering benefits, managing tax withholdings and payments, and ensuring compliance with employment regulations. In return, AARP agreed to pay Aquent a monthly fee equal to the wages Aquent paid plus a markup that would cover,

among other things, the cost of the benefits Aquent provided and Aquent's operating costs. After paying monthly invoices through the substantial majority of 2023, AARP suddenly stopped paying in 2024, and then, after months of putting off Aquent's inquiries and while still accepting the benefit of Aquent's services, AARP suddenly announced that the AARP executive who signed this contract—its Senior Director of Business and Financial Operations—did so without authority.  Even more extreme, AARP took the position that it had no obligation to pay for any of the services that Aquent had provided or even to reimburse Aquent for the millions of dollars Aquent paid employees to work at AARP.

AARP then went even further by withholding in bad faith approximately $3.3 million that it undisputedly owes Aquent under a separate contract through which Aquent has provided outsourced services to AARP's Digital Strategy & Membership department.  AARP is using those funds as leverage to try to force Aquent to walk away from millions of dollars to which it is lawfully entitled under the other contract.  Further still, when AARP was nearly eight months behind on invoices under the employer of record contract such that Aquent had no choice but to exercise its express right to terminate the contract for AARP's failure to pay invoices within forty-five days, AARP responded by precipitously terminating the outsourced services contract with immediate effect, despite the fact that AARP's only right of termination under that contract required thirty days advance notice.

AARP's actions have been taken in bad faith.  In addition to not paying invoices totaling more than $8 million, AARP's actions have resulted in the abrupt termination of approximately seventy people who were diligently providing services to AARP from within AARP's offices. AARP has never complained about the quality of those employees' work (nor could AARP do so reasonably), but nevertheless maintains that it is entitled to the value of those employees' work

under the employer of record contract without having to pay *anything*—not even the wages that Aquent advanced.

## PARTIES

1.      Aquent is a Delaware limited liability company with a principal place of business at 501 Boylston Street, Boston, MA 02116, whose sole member is TRI Ventures, Inc., a Massachusetts corporation with its principal place of business in Massachusetts.  Aquent is a global work solutions company that, among other things, helps its corporate clients find specialized temporary and permanent staffing (or talent) for high-end marketing, creative, and design services.

2.      AARP is a not-for-profit corporation organized under the laws of the District of Columbia with a principal place of business at 601 E Street, NW, Washington, DC 20049. AARP contracted with Aquent to receive staffing services.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

4.      This Court has personal jurisdiction over AARP insofar as it is a citizen of the District of Columbia.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because AARP resides in the District of Columbia and a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.

## FACTS

### I.    The Master Services Agreement For Services

6.      AARP and Aquent were parties to a Master Services Agreement for Services, entered as of August 26, 2013 (the "MSA"), which served as an umbrella agreement for the parties to work together on a variety of engagements.  (A copy of the MSA is attached as Exhibit A.)  More particularly, the MSA provided a general set of terms and conditions that the parties could apply to individual engagements.  Under that arrangement, when the parties wished to work together, they would enter a short form document referred to as an "MSA Attachment," which would detail the services that Aquent would provide, the fees and costs AARP would pay, and would incorporate the MSA by reference.  The MSA's terms would then apply to that engagement as long as they were not inconsistent with the terms in the MSA Attachment.  (In the event of a conflict between the two, the MSA Attachment would control.)  *See* Ex. A, § 1.4.

7.      While the parties contemplated that there would be multiple engagements, they agreed that each MSA Attachment would constitute a separate contractual agreement.  *See* Ex. A, §§ 1.1, 1.3.

8.      Until this past year, the parties' relationship was harmonious.  As recently as 2018, AARP awarded Aquent its Supplier of the Year award.

### II.    The Employment of Record Services Contract

9.      On February 7, 2023, AARP and Aquent entered an MSA Attachment for Aquent to provide Employment of Record Services (the "EOR Contract").  (A copy of the EOR Contract is attached as Exhibit B.)  These services are common in the staffing industry.  Under these arrangements, employees work directly for the staffing firm's client, and the staffing firm takes

4

full responsibility for all aspects of employment including compliance, payroll taxes and benefits.

10.     Upon information and belief, before entering the EOR Contract, AARP was obtaining the services of a number of people through different EOR arrangements and wished to consolidate them with Aquent.

11.     Under the EOR Contract, Aquent became the employer of record for approximately forty employees who were working in AARP's offices under the direct supervision of AARP's managers.  Over time, the number of employees who provided services to AARP under this arrangement varied.  Some of those employees were salaried and some were paid hourly.

12.     Under the EOR Contract, Aquent assumed the responsibility to pay:  (a) the employees' wages; (b) the employer taxes associated with their employment; and (c) a generous package of benefits that AARP selected.  *See* Ex. B, § 3 & Attachment A.  For example, the benefits package AARP selected for salaried employees included, among other things, paid time off, six weeks of paid parental leave, two weeks of caregiving leave per year, health insurance, dental insurance, life insurance, disability insurance, 401(k) matching, and tuition reimbursement.  *See id.*  AARP decided to extend most of those benefits to hourly employees, albeit in lesser amounts.

13.     In addition to paying the cost of those wages and benefits, Aquent took responsibility for performing payroll services, including tax withholdings, and ensuring compliance with a range of employment laws, including the Affordable Care Act.  *See* Ex. B, §§ 3(a), (c), (e).

14.     In return for Aquent providing these services, AARP agreed to pay Aquent the cost of the employees' wages with a 42% markup that would, among other things, pay for the cost of the benefits Aquent provided and the cost of administering services like payroll services. *See* Ex. B, § Attachment A.

15.     Aquent agreed to bill AARP monthly, and AARP agreed to pay invoices within forty-five days of receipt.  *See* Ex. B § 7.

16.     Recognizing the significant expense Aquent was incurring to fund employees working at AARP, the EOR Contract made clear that Aquent had the right to terminate the agreement if AARP did not pay an invoice within forty-five days of the due date.  *See* Ex. B. § 4.

17.     In 2023, Aquent's monthly invoices under the EOR Contract totaled nearly $4.5 million.  AARP timely paid each of those invoices.

**III.     The Outsourced Services Contract**

18.     On September 1, 2023, AARP and Aquent entered a separate MSA Attachment pursuant to which AARP retained Aquent to provide Outsourced Services (the "Outsourced Services Contract").  (A copy of the Outsourced Services Contract is attached as Exhibit C.) Under this contract, Aquent agreed to provide specified services to AARP's Digital Strategy & Membership department for a not-to-exceed monthly fixed fee of $419,068.32.  *See* Ex. C § 7.0.

19.     To provide those services, Aquent staffed dozens of employees at AARP's offices.  Many of those employees had long provided services to AARP under other MSA Attachments.

20.     The Outsourced Services Contract did not specify the circumstances in which either party could terminate the arrangement, but under the MSA, AARP had "the right to terminate any MSA Attachment upon advance notice of thirty (30) days."  Ex. A § 2.1.

**IV.      AARP Withholds Payment On Specious Grounds**

21.      In or about March 2024, AARP stopped paying Aquent's invoices under both the EOR Contract and the Outsourced Services Contract without explanation.  It nevertheless continued to accept the valuable services provided by nearly seventy people working in AARP's offices under the EOR Contract and Outsourced Services Contract.

22.      Over the next several months, Aquent followed up with AARP to inform it of the growing amount due.  AARP's refrain was that the delays in payment were due to an administrative error caused by incorrect purchase order numbers.

23.      Such errors happen from time to time with large clients, and Aquent attempted to work with AARP to correct the issue and secure payment, despite the large accounts receivable that was accruing.  By August 2024, Aquent's accounts receivable for AARP had accrued to over $6 million.

24.      On August 16, 2024, AARP sent Aquent a letter that suddenly changed its explanation for the delayed payments.  In the letter, AARP asserted that it had conducted an internal audit of payments made to Aquent from 2022 through August 16, 2024, and determined that AARP had overpaid Aquent by $6.4 million.

25.      Through conversations with AARP's representatives, it became clear that AARP's audit had failed to account for the EOR Contract pursuant to which Aquent had been providing employer of record services for the previous eighteen months.

26.      AARP later responded that it was not bound by the EOR Contract because the AARP representative who signed the EOR Contract, Kimberly Hardy-Barnes, AARP's Senior Director of Business and Financial Operations, did not have the authority to enter into the agreement.  Without disputing the great value AARP had received from the scores of employees

7

who had been working for AARP's managers in AARP's offices for eighteen months, AARP took the incredible position that it was not obligated to pay Aquent anything for those employees and that it could use prior payments under the EOR Contract as a basis not to pay invoices issued under the separate Outsourced Services Contract.  AARP did not, however, ask Aquent to stop providing EOR services or that the employees who were working for AARP under that arrangement stop doing so.

27.     Aquent tried to reason with AARP representatives on multiple different occasions, explaining that even assuming that AARP was correct that Ms. Hardy-Barnes was not authorized to sign the EOR Contract, as an executive in charge of business and financial operations, Aquent reasonably believed she was so authorized, and that AARP was bound by the EOR Contract because she had acted with apparent authority.  Moreover, the EOR employees at issue had been working at AARP for eighteen months in full view of other executives of AARP. And for almost a year, AARP had paid Aquent pursuant to the terms of the EOR Contract.  By so doing, AARP ratified the EOR Contract.

28.     AARP responded by holding out the prospect of future services to try to get Aquent to forego what it was owed for a fraction of the amount due that was far less than even the wages Aquent paid the employees who worked for AARP full time.  AARP also refused to pay undisputed invoices that were due under the Outsourced Services Contract unless Aquent would accept the pennies AARP offered under the EOR Contract.

29.     Aquent declined that unreasonable offer and explained that while it was open to continuing discussions, more immediately, it could not continue to provide EOR services at a cost of approximately $100,000 per week unless AARP would commit to at least making Aquent whole on a going forward basis.  On October 4, 2024, when AARP had not made the

8

commitment Aquent requested, Aquent informed AARP that absent a change in AARP's position, Aquent would stop providing services on October 11, 2024.

30.     When AARP had not responded by the morning of October 10, 2024, Aquent sent AARP a notice that it was invoking its right to terminate the EOR Contract for AARP's failure to pay invoices within forty-five days.  *See* EOR Contract § 7.  As Aquent had previously informed AARP, the termination was effective on Friday, October 11, 2024.

31.     Because of AARP's actions, Aquent was forced to terminate the approximately forty employees who had been on-site at AARP pursuant to the EOR Contract.

32.     After 5:00 p.m. on Friday, October 11, 2024, AARP sent Aquent a notice that it was terminating the MSA and the Outsourced Services Contract with immediate effect.  That termination, which came without notice, was in breach of the parties' agreements.  In particular, Section 2.1 of the MSA makes clear that AARP can only terminate MSA Attachments on thirty days' notice.  *See* Ex. A § 2.1.  Because of AARP's abrupt action, over a holiday weekend, Aquent had to notify the approximate thirty people who were performing services under the Outsourced Services Contract that they should not return to work on Tuesday and regrettably had to be let go.

33.     As of today, AARP is past due on more than $7.5 million of invoices—approximately $4.2 million under the EOR Contract and approximately $3.3 million under the Outsourced Services Contract.  If AARP maintains its position and refuses to pay other invoices that will soon come due, that sum will increase as additional invoices become due, including invoices through the termination of the EOR Contract and Outsourced Services Contract.

34.     In addition, Aquent has incurred damages associated with AARP's abrupt termination of the Outsourced Services Contract.

**COUNT I**
**Breach of EOR Contract**

35.     Aquent incorporates by reference the allegations contained in paragraphs 1 through 34 of this Complaint, as if fully set forth herein.

36.     The EOR Contract is a binding and enforceable contract between the parties governing the conditions under which AARP was required to pay for the EOR services.

37.     Aquent has fully performed its obligations under the EOR Contract.

38.     AARP has breached the EOR Contract by failing to timely pay invoices issued under that contract.

39.     By reason of the foregoing, Aquent has been damaged in an amount to be proven at trial.

**COUNT II**
**Quantum Meruit**
**(In the alternative to Count I)**

40.     Aquent incorporates by reference the allegations contained in paragraphs 1 through 34 of this Complaint, as if fully set forth herein.

41.     Aquent bestowed a valuable benefit on AARP by serving as the employer of record for scores of employees who worked full time at AARP between January 1, 2024, and October 11, 2024, including the benefits of those employees' labor, without AARP having to directly bear the cost of those employees' labor.

42.     AARP accepted Aquent's services, including the services of the employees for whom Aquent served as employer of record.

43.     AARP had reasonable notice that Aquent expected compensation from AARP for serving as the employer of record for those employees, including, among other things, in the EOR Contract and in the monthly invoices that Aquent sent, and AARP paid, in 2023.

44.     It would be inequitable for AARP to keep the benefit of the services Aquent provided without paying for them.

45.     By reason of the foregoing, Aquent should be compensated in an amount to be proven at trial.

**COUNT III**
**Unjust Enrichment**
**(In the alternative to Count I)**

46.     Aquent incorporates by reference the allegations contained in paragraphs 1 through 34 of this Complaint, as if fully set forth herein.

47.     Aquent conferred a valuable benefit on AARP by serving as the employer of record for scores of employees who worked full time at AARP between January 1, 2024, and October 11, 2024, including reaping the benefits of those employees' labor without having to directly bear the cost of their labor.

48.     AARP was aware of the benefit Aquent provided and should have reasonably expected to pay Aquent for that benefit.

49.     AARP accepted or retained the benefit Aquent provided under circumstances that make it inequitable for AARP to keep that benefit without paying for it.

50.     There is no justification for the enrichment and the impoverishment referenced above.

51.     Aquent has no legal recourse.

52.     By reason of the foregoing, AARP should pay restitution for the value of the benefit it received.

## COUNT IV
## Breach of Outsourced Services Contract

53.     Aquent incorporates by reference the allegations contained in paragraphs 1 through 34 of this Complaint, as if fully set forth herein.

54.     The Outsourced Services Contract is a binding and enforceable contract between the parties governing the conditions under which AARP was required to pay for the Outsourced services.

55.     Aquent has fully performed its obligations under the Outsourced Services Contract.

56.     AARP has breached the Outsourced Services Contract by:  (a) failing to pay invoices issued under the contract; and (b) terminating the Outsourced Services Contract on less than thirty (30) days' notice.

57.     By reason of the foregoing, Aquent has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Aquent asks that the Court grant judgment in its favor and against AARP on all Counts, and grant Aquent the following relief:

ii.     An award of actual damages in amounts to be determined at trial;

iii.    An award of attorney fees, costs, and expenses incurred in association with this action;

iv.     Pre-judgment and post-judgment interest; and

v.      Such other and further relief as the Court deems appropriate.

Respectfully submitted,

AQUENT, LLC

By its attorneys,

/s/ Albinas J. Prizgintas
Albinas J. Prizgintas (D.C. Bar No. 1006955)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
albinas.prizgintas@wilmerhale.com

John J. Butts*
Emily S. Summit*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
john.butts@wilmerhale.com
emily.summit@wilmerhale.com
*Pro hac vice forthcoming

Dated:  October 17, 2024